FILED
MISSOULA, MT

2002 MAY -3   PM 3: 00

PATRICK E DUFFY CLERK
BY_____ M. Nube
        34

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| NATIVE ECOSYSTEMS COUNCIL, THE ECOLOGY CENTER, INC., and THE SIERRA CLUB, | ) ) ) | CV 01-177-M-DWM |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) ) | ORDER |
| | ) | |
| UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture; TOM CLIFFORD, Supervisor, Helena National Forest; KATHLEEN McALLISTER, Acting Regional Forester for Region One U.S. Forest Service; and DALE BOSWORTH, Chief of the United States Forest Service, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## I.   Introduction

This case involves a proposed fire salvage sale in an area burned by the Maudlow-Toston Fire in the summer of 2000.   The proposed sale is located in the Helena National Forest near Townsend, Montana.   Plaintiffs, a number of

1

UNITED STATES OF AMERICA
DISTRICT OF MONTANA } ss

I, Patrick E. Duffy, Clerk of the United States District Court for the District of Montana, hereby certify that the above and forgoing is a true copy of the original now on file in my office.

Dated this _____ day of
_____ 20 02

PATRICK E. DUFFY, Clerk
By_____ M. Nube
        Deputy

(collectively referred to as Native Ecosystems), allege the
Forest Service violated the National Forest Management Act (NFMA)
and the National Environmental Policy Act (NEPA) making its
decision to proceed with the sale the decision arbitrary and
capricious. The Forest Service contends Native Ecosystems did
not meet its burden to show the decision was arbitrary and
capricious. The Forest Service also maintains it took the
requisite "hard look" at all environmental impacts and that it
complied with the NFMA and the Helena National Forest Plan (the
Forest Plan).

## II. Factual and Procedural Background

The Maudlow-Toston Fire was one of many fires to blacken
much of western Montana during the summer of 2000. The Maudlow-
Toston Fire itself burned over 81,000 acres of private, state and
federal land between August 15 and September 30, 2000, including
nearly 11,000 acres in the Helena National Forest near Townsend,
Montana. Immediately following the fire, the Forest Service
implemented a Burned Area Emergency Rehabilitation plan and
short-term emergency treatments. Simultaneously, the Forest
Service began assessing whether salvage logging would be
appropriate in burned areas.

In January 2001, the Forest Service released for public
comment a Draft Environmental Impact Statement setting forth four
proposed alternatives for managing the burned areas. The

2

alternatives included a no action alternative; a harvest only alternative allowing logging without mitigation measures; an alternative allowing logging with mitigation measures; and an alternative allowing logging, along with mitigation measures and reforestation.  In response to public comment, the Forest Service added a fifth alternative that was a variation of the logging-mitigation-reforestation alternative.

On May 7, 2001, the Forest Supervisor issued its Record of Decision and Final Environmental Impact Statement (FEIS) selecting the fifth alternative for implementation.  The fifth alternative allows logging on approximately 1,351 acres of the Helena National Forest.  Logging will occur by tractor, cable, and helicopter.

Native Ecosystems appealed the Forest Supervisor's decision on July 2, 2001.  On August 16, 2001, the Regional Forester denied the appeal.  Native Ecosystems filed suit in this Court on October 5, 2001.  Between May 7, 2001, when the Forest Supervisor issued the Record of Decision, and October 18, 2001, a number of Supplemental Information Reports were prepared analyzing new information or clarifying information in the FEIS.  On October 18, 2001, the Forest Supervisor determined that the new information did not alter his decision and that a supplemental environmental impact statement was not necessary.  The Supplemental Information Reports issued after May 7, 2001 are the

3

subjects of Native Ecosystems' motion to strike discussed below.

### III.  Plaintiffs' Motion to Strike

Native Ecosystems moves to strike certain documents in the
Administrative Record that were not available or were dated after
the Forest Service issued its Record of Decision.[1]  Native
Ecosystems contends the challenged documents should not be part
of the Administrative Record because they were not available when
the Forest Service issued its Record of Decision and could not
have been relied upon by the Forest Service in making its
decision to allow salvage logging.  Native Ecosystems
characterizes the challenged documents as improper "post-hoc
rationalizations of a previously made decision."

The Forest Service counters that the challenged documents
are not post-hoc rationalizations of its earlier decision, but
are part of its continuing duty to analyze new information and
take a "hard look" at potential environmental effects of the
sale.  The Forest Service avers that the challenged documents are
not part of the decision to allow salvage logging made on May 7,

---

[1] Specifically, Native Ecosystems moves to strike (1) the
Supplemental Information Report on soil resources, dated October
1, 2001, and supporting documents, Admin. Rec., vol. 12, P-18 to
P-33; (2) the Supplemental Information Report on watershed, dated
October 1, 2001, and related documents, Admin. Rec., vol. 12, P-
34 to P-41; (3) the Supplemental Information Report on fisheries,
dated September 29, 2001, Admin. Rec., vol. 12, P-42; (4) the
undated Supplemental Information Report on wildlife, and related
documents, Admin. Rec., vol. 12, P-43 to P-45; and (5), the
Review-Maudlow-Toston Post-Fire Salvage Sale FEIS, dated October,
2001, Admin. Rec., vol. 12, P-17.

2001, but are part of a separate decision that the new information did not require a supplemental environmental impact statement.

Friends of the Clearwater v. Dombeck is dispositive of this issue. In Friends of the Clearwater, the plaintiffs asserted the same arguments before the Ninth Circuit as Native Ecosystems asserts here. Specifically, the plaintiffs argued that the Ninth Circuit could not consider supplemental studies in determining whether the Forest Service acted arbitrarily and capriciously in refusing to perform a supplemental environmental impact statement because the studies were not part of the administrative record when the Forest Service made its decision. 222 F.3d 552, 560 (9th Cir. 2000). The Ninth Circuit disagreed, determining that the supplemental materials were properly before the court. Id. at 561.

Ironically, Native Ecosystems does not mention Friends of the Clearwater in it opening argument on its motion to strike.[2] In its reply brief, Native Ecosystems seeks to distinguish Friends of the Clearwater as a situation where the Ninth Circuit considered supplemental reports to determine "whether the

---

[2] Native Ecosystems cites Friends of the Clearwater in support of its alternate argument requesting leave to amend its complaint. Native Ecosystems cites Friends of the Clearwater for the proposition that "[w]hen new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require an [SEIS]."

plaintiffs were entitled to injunctive relief."  While Native

Ecosystems is correct, the Ninth Circuit's decision was not so

narrow.  Specifically, the Ninth Circuit noted that

> if extra-record evidence shows that an agency has
> rectified a NEPA violation after the onset of legal
> proceedings, that evidence is relevant to the question
> of whether relief should be granted.

Id. at 560.  There is no indication that this language is limited

to situations where a court is considering whether injunctive

relief is appropriate, other than that the Ninth Circuit was

deciding whether injunctive relief would be appropiate.  To the

contrary, the Ninth Circuit cited the supplemental reports as

proof that the Forest Service had rectified its previous error of

failing to consider new information to determine whether a

supplemental environmental impact statement was necessary.  Id.

In the end, the Ninth Circuit determined "it would serve no

useful purpose to remand this case to the district court for it

to order the Forest Service to prepare studies that the Forest

Service already has completed and that cannot be successfully

challenged."  Id. at 561.

In this case, the Forest Service continued to receive

potentially significant information after it issued its Record of

Decision on May 7, 2001.  In accord with its "continuing duty to

gather and evaluate new information relevant to the environmental

impact of its actions even after release of an [environmental

impact statement," the Forest Service prepared Supplemental

Information Reports to analyze the new information to determine whether a supplemental environmental impact statement was warranted.  Id. at 559 (quotations and citation omitted).  This is precisely what the Forest Service is required to do.

Further, the Supplemental Information Reports are not post-hoc rationalizations of its earlier decision.  As stated earlier, the Supplemental Information Reports were prepared in response to potentially significant new information and in response to the Forest Supervisor's continuing duty.  That the supplemental reports ultimately support the Forest Service's original decision does not make them post-hoc rationalizations.

The Supplemental Information Reports objected to by Native Ecosystems are part of the Administrative Record and are appropriately before the Court.  Native Ecosystem's motion to strike is not well-taken and is denied.

## IV.  Cross-Motions for Summary Judgment

### A.  Summary of the Parties' Arguments

Native Ecosystems alleges a number of specific violations by the Forest Service in drafting and selection the fifth alternative.  The allegations can be grouped into two categories: first, the Forest Service violated the NFMA because its decision was arbitrary and capricious in failing to consider a number of factors and is inconsistent with the Forest Plan; second, the Forest Service violated the NEPA because it failed to take a

7

"hard look" at potential environmental concerns.

The Forest Service argues that Native Ecosystems is citing portions of the Record of Decision and the FEIS out of context. The Forest Service contends the project complies with NFMA and NEPA and that the Forest Service took the requisite hard look and considered all foreseeable environmental harms that could occur as a result of the project. The Forest Service also contends its decision to go forward with the project under the provisions of alternative five was not arbitrary or capricious and must be upheld by the Court.

## B.  Standard of Review

Agency actions challenged under NFMA are reviewed "to determine if they were arbitrary and capricious, an abuse of discretion, or not in accordance with the law." <u>Neighbors of Cuddy Mountain v. United States Forest Service</u>, 137 F.3d 1372, 1376 (9th Cir. 1998). Under NEPA, the Court applies a "rule of reason" to determine whether the FEIS "contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." <u>Id</u>. (internal quotations omitted). For challenges under NEPA, the Court must determine only whether the agency took a "hard look." <u>Id</u>. The rule of reason analysis is "essentially the same" as an abuse of discretion review." <u>Id</u>.

These standards are highly deferential requiring the Court to defer to the Forest Service if its decision is "fully informed

8

and well-considered." <u>Blue Mountain Biodiversity Project v.</u>
<u>Blackwood</u>, 161 F.3d 1208, 1211 (9th Cir. 1998)(quotations and
citation omitted).  While the Court need not forgive "a clear
error of judgment," neither may the Court substitute its own
judgment for that of the Forest Service.  <u>Citizens to Improve</u>
<u>Overton Park, Inc. v. Volpe</u>,  401 U.S. 402, 416 (1971) (overruled
on other grounds by <u>Califano v. Sanders</u>, 430 U.S. 99 (1977)).

**C. The National Forest Management Act**

NFMA supplies a two-step analysis for forest planning.
<u>Neighbors of Cuddy Mountain</u>, 137 F.3d at 1376.  First, the Forest
Service must develop a Land Resource Management Plan and an
Environmental Impact Statement for the entire forest.  36 C.F.R.
§ 219.1 to 219.2.  Next, the Forest Service implements the Land
Resource Management Plan on a site-specific level to assess site-
specific projects, such as timber sales.  36 C.F.R. § 219.10.
The site-specific decision "must be consistent with the [Land
Resource Management Plan] for the larger area."  <u>Neighbors of</u>
<u>Cuddy Mountain</u>, 137 F.3d a 1376-77.

**1.  Economics**

The Helena National Forest Plan requires the Forest Service
to perform a feasibility and cash flow analysis for all timber
sales over one million board feet.  Native Ecosystems contends
that the Forest Service's cash flow analysis for the Maudlow-
Toston Salvage Project was improper and inaccurately disclosed

9

public costs and benefits.  As evidence, Native Ecosystems contends the Forest Service used thousand board feet and hundred cubic feet measurements interchangeably.  Native Ecosystems argues the proposed sale will not make money, even though making money is one of the claimed goals of the sale.  Native Ecosystems claims the faulty economic analysis is proven because the actual bid received is drastically lower than the predicted high bid.

The Forest Service maintains it performed a proper cash flow analysis, but the numbers were initially incorrect because the model used did not factor in the lesser value of burnt timber versus green timber.  The Forest Service contends that the more sophisticated analysis model calculated a projected high bid of $604,030, or within approximately ten percent of the actual bid of $542,357.84.  The Forest Service maintains that when using the more sophisticated analysis model and excluding all "non-harvest costs," revenues will exceed harvest costs on all alternatives.

The Helena National Forest Plan requires a feasibility analysis of each proposed timber sale over one million board feet "to assure that it has been designed with the most cost-effective measure possible in keeping with environmental concerns" and a cash-flow analysis "to determine the viability of the sale with current market conditions."  Helena National Forest Plan, April 1986, at II/23-II/24.  If anticipated costs are higher than the predicted high bid, the Forest Service must consider whether to:

a.  Defer the sale until economic conditions would
indicate receiving higher bids.
b.  Proceed to sell the timber and provide proper
documentation that benefits, other than immediate
monitary (sic) return from the timber, are of
importance.

Id. at II/24.

The July 18, 2001 Supplemental Information Report indicates

that, though the Present Net Value will be negative, the Net Sale

Value will be positive.[3]  The Supplemental Information Report

indicates that the Forest Service considered the change and

determined the sale would still be above-cost when considering

only harvest-related costs.  The Forest Service recognized the

new projected high-bid constituted a changed circumstance, but

determined the sale still best met land management objectives and

Forest Plan directives.

On its face, the Forest Plan's language does not require the

Forest Service to halt a timber sale if the predicted costs are

greater than the predicted high bid.  Rather, the Forest Service

must consider the above factors, one of which allows the timber

sale to proceed.  The July 18, 2001 Supplemental Information

Report indicates the Forest Service considered the new projected

cost information and determined the sale would still be above

_____

[3] The Present Net Value represents the "total harvest
revenues and costs of harvest and non-timber related projects."
Administrative Record, Vol. 12, P 16-2.  The Net Sale Value
represents the "estimated harvest revenues and costs, including
mitigation."  Id.

11

cost and that proceeding with the proposed sale was the best course of action. The Forest Plan does not mandate that timber sales make money, nor does it require the Forest Service to hald a sale if the actual bid is less than the projected high bid. In this case, the Court cannot say that the Forest Service's determination that the proposed sale will be above cost and decision to proceed were arbitrary or capricious.

### 2. Soil and Water Quality Impacts

Native Ecosystems argues that the proposed sale will impact 27.5% of the project area, though the Forest Plan limits soil impacts to 15% of project areas. Native Ecosystems also contends that, in making its decision, the Forest Service failed to use the best available science. Native Ecosystems notes that water quality monitoring was being performed at the time the Record of Decision and FEIS were issued and so could not have been considered by the Forest Service in making its decision.

The Forest Service recognizes that the Forest Plan contains a 15% soil impact guideline, but maintains it is not binding. Even so, the Forest Service maintains the proposed sale meets the 15% guideline. The Forest Service claims that only 55 acres of soil is potentially affected by the sale, with cumulative detrimental effects on 545 acres, or 5.2% of the proposed timber sale. The Forest Service asserts that water quality monitoring Plaintiffs claim was not complete at the time the Record of

12

Decision was issued was actually a continuation of yearly water
quality monitoring by the State of Montana.

In Kettle Range Conservation Group v. United States Forest
Service, the court found the Forest Service's soil analysis did
not constitute a hard look.  148 F. Supp. 2d 1107, 1127 (E.D.
Wash. 2001).  Key to the court's decision was that many units
suffered from detrimental soil conditions, but the Forest Service
"did not take the time to walk the areas they planned to harvest"
or take any samples.  Id.  Rather, the Forest Service relied on
existing data and photographs to estimate the extent of any
detrimental conditions.  Id. at 1125-26.

Here, the Administrative Record indicates the Forest Service
performed extensive on-ground soil analysis for the Burned Area
Emergency Rehabilitation Plan and then incorporated that data
into the FEIS.  The Forest Service continued to analyze data on
detrimental effects to soil and water after the FEIS was issued
quality, ultimately recognizing significant new information
existed and issuing Supplemental Information Reports analyzing
the new data and determining a supplemental EIS was not required.

The situation here is not the same as that in Kettle Range
where the Forest Service relied solely on existing data and
estimates.  Here, the Forest Service collected and analyzed raw
data before and after the Record of Decision and FEIS were
issued.  Analyzing new information does not indicate the Forest

Service was wrong in its initial decision. To the contrary, it indicates the Forest Service was complying with its "continuing duty to gather and evaluate new information." Friends of the Clearwater, 222 F.3d at 559.

### 3. Hiding Cover

Native Ecosystems argues that while the proposed sale will cause hiding cover to decline from 56% to 49%, the Forest Service did not analyze the decline in the FEIS. The Forest Service counters that the FEIS contains more than six pages of hiding cover analysis and that Native Ecosystems' assertion is based on one page of handwritten notes taken out of context. The Forest Service notes that no green canopy will be harvested and, even assuming the 49% figure is accurate, the proposed sale complies with the Forest Plan, which requires maintaining only 35% hiding cover.

The Administrative Record and the FEIS indicate that the Forest Service analyzed the effects of the proposed sale on hiding cover. The Forest Service concluded that any loss of hiding cover would be "negligible," coming only from the removal of green trees for "safety regulations, landings, and skid trails." FEIS, at 52. Ultimately, the Forest Service undertook a reasoned analysis of the changes in hiding cover and determined to proceed with the sale.

Additionally, the Forest Plan requires a minimum of 35%

14

hiding cover be maintained in elk summer range.  As noted by the Forest Service, even if Native Ecosystems is correct, 49% hiding cover complies with the Forest Plan.  Thus, the decision cannot be arbitrary and capricious because of a failure to consider hiding cover.

### 4.  Managing Old Growth

Native Ecosystems contends that Forest Service records indicate old growth timber will be logged in certain units of the proposed sale.  The Forest Service maintains that because only dead trees will be cut and that stands of entirely dead trees, by definition, are not old growth, an inventory was not necessary.

Native Ecosystems' offers a confusing argument on this point.  It does not appear Native Ecosystems is arguing that the Forest Service is violating the Forest Plan by failing to consider effects on old growth.  Rather, the argument appears to be that the Forest Service is going to allow old growth timber to be harvested.

The Forest Plan defines old growth stands as those

generally characterized by a high level of standing and down, dead and rotting woody material; two or more levels of tree canopies and a high degree of decadence indicated by heart rot, mistletoe, dead or broken tree tops, and moss.

Helena National Forest Plan, April 1986, at II/20.  The Forest Service determined that living old growth will not be affected because only dead and dying trees will be harvested.

15

Further, the contract allows only dead and dying trees to be harvested.

### 5. Goshawk

Native Ecosystems asserts that the Forest Service agreed that if goshawks were found in the area, the proposed sale would be re-analyzed and the harvest activities modified. Native Ecosystems asserts that a post-FEIS field report indicated a goshawk was seen in the area and its behavior was consistent with nesting, but the Forest Service did not re-analyze or modify the proposed sale.[4]

The Forest Service maintains that the proposed sale will be modified if goshawk nesting is confirmed, but there has not been any confirmed nesting. The Forest Service notes that field reports indicate no goshawk nests were seen in 1998 and no individual goshawks were present in 2000. The Forest Service also maintains that many snags will be left for nesting and that it is reasonable to conclude that any impacts on the goshawk from the proposed sale would be short-term.

The Forest Service is not required to halt logging after a sighting of a goshawk. While Native Ecosystems alleges a sighted goshawk's behavior was consistent with nesting, it does not allege nesting has been confirmed. Based on the record, the

---

[4] According to an accounting of the encounter, the goshawk exhibited "aggressive screaming, stayed within 100 feet of us the entire time we were in the area–possible nest in the area?"

16

Forest Service's conclusion that proceeding with the proposed sale will not significantly impact the goshawk is not arbitrary and capricious.

### 6.  Conclusion

After reviewing the record as a whole, the Court cannot determine that the Forest Service violated NFMA in deciding to proceed with the Maudlow-Toston Salvage Sale.  The proposed sale is consistent with NFMA and consistent with the Forest Plan. Therefore, the Forest Service's decision is not arbitrary or capricious.

### D.  The National Environmental Policy Act

#### 1.  Purpose and need for the project

Native Ecosystems asserts that the stated purposes of the proposed sale are to (1) recover burned timber before it decays, and (2) to accelerate long term fire recovery and protect soils, watersheds and habitat during recovery.  Native Ecosystems claims the proposed sale does not meet the first purpose because it will lose money, as evidenced by the actual bid being only 20% of the projected high bid.  Native Ecosystems avers that removed restoration costs jeopardize the second purpose because the FEIS does not disclose whether restoration will be funded with or without timber receipts.  Native Ecosystems also contends the Forest Service did not take the requisite hard look at the proposed sale because it did not consider the Beschta Report.

17

The Forest Service counters that the _purpose_ for the project is to recover burned timber, while the _need_ is to recover the value of the timber before it decays.  The Forest Service maintains that economic value is not a purpose of the project, and that it took the required hard look, considered the Beschta Report, and determined there were no landslide-prone soils.

Native Ecosystems does not argue that the stated purpose of the sale is improper.  Rather, the disagreement between the parties is over the meaning of the stated purpose.  Native Ecosystems believes "to recover burned timber before it decays and is no longer economically viable" means the purpose of the sale is to make money.  A plain reading of the stated purpose, however, does not lend the same definition Native Ecosystems seeks to assign.  The value of the timber can be recovered regardless of whether the Forest Service makes or loses money on the sale.

Further, a plain reading of the stated purpose supports the Forest Service's argument.  The Purpose and Need section of the FEIS states "[t]he immediate _need_ is to recover the value of burned commercial timber product before it decays and is no longer economically viable."  FEIS, at 7.  Thus, the economic element is a need, rather than a purpose of the project

Native Ecosystems appears to agree that the Forest Service has met the need to "implement actions that accelerate long-term

fire recovery and protect soils, watersheds, and wildlife habitat while this recovery occurs."  Native Ecosystems' quarrel is limited to how the need will be funded.  Native Ecosystems contends that means for funding rehabilitative measures are not set forth in the FEIS.  While Native Ecosystems argues that means of funding rehabilitative measures should have been addressed in the FEIS, they do not say why.  Nor does Native Ecosystems cite any authority for its proposition.

## 2.  Mitigation

Native Ecosystems contends the Forest Service failed to undertake mitigation measures because it did not wait for monitoring results before issuing its Record of Decision and FEIS.  Native Ecosystems also argues that the Forest Service incorrectly assumed the Burned Area Emergency Rehabilitation Plan would provide the intended results because it is based on inaccurate and incomplete information.  The Forest Service maintains it was only required to undertake a reasonably complete discussion of mitigation measures and the discussion in the FEIS was thorough and well-considered.

The Forest Service is obligated to describe mitigating measures that can be used to off-set any damages from a timber sale.  Neighbors of Cuddy Mountain, 137 F.3d at 1380.  A "perfunctory description" of mitigating measures does not satisfy the hard look required by NEPA.  Id.  Mitigation measures "must

be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." Id. Simply listing mitigation measures "is insufficient to qualify as the reasoned discussion required by NEPA." Id. (citations and quotations omitted).

In Neighbors of Cuddy Mountain, the Forest Service acknowledged that increased sediment from a timber sale would negatively impact redband trout, but did not discuss how mitigation measures would decrease sedimentation. Id. at 1381. In fact, the Forest Service did not provide any detailed discussion of mitigation measures, despite the fact that the Forest Service's own experts found the proposed mitigation measures "so general that it would be impossible to determine where, how, and when they would be used and how effective they would be." Id.

Likewise, in Blue Mountains Biodiversity Project, the Ninth Circuit found the Forest Service's discussion of mitigation measures inadequate where the Forest Service relied on Best Management Practices based on "past observations of logging on unburned areas." 161 F.3d at 1213 (emphasis in original). The Ninth Circuit determined that the Environmental Assessment in Blue Mountains Biodiversity Project did not support the Forest Service's position that Best Management Practices from unburned areas would be adequate in severely burned areas.

20

In this case, the Forest Service discusses potential mitigation measures throughout the FEIS.  The Forest Service does not merely list mitigation measures, nor does it rely on wholly inappropriate measure.  Rather, the Administrative Record reflects a reasoned analysis of potential detrimental effects and measures to mitigate those effects.  This is sufficient for the Forest Service to meet its burden under NEPA.

### 3.  Alternatives

Plaintiffs allege the Forest Service failed to develop or discuss alternatives to its selected option.  The Forest Service maintains it is not required to discuss or consider alternatives that would not achieve the stated purpose of the project.  However, the Forest Service notes it considered multiple alternatives.

Under NEPA, the Forest Service is required to consider a "reasonably full range of alternatives."  The Island Range Chapter of the Montana Wilderness v. United States Forest Service, 45 F. Supp. 2d 1006, 1010 (D. Mont. 1996).  The consideration of an appropriate range of alternatives is sufficient even if every available alternative is not considered. Id.  NEPA does not require the Forest Service to separately consider alternatives that are not significantly distinguishable, nor does NEPA require the Forest Service to consider alternatives that "do not achieve the purpose of the proposed action."  Id. at

21

1010-11.

The Administrative Record indicates that the Forest Service considered five alternatives in detail in the FEIS and considered and eliminated three others.  The alternatives considered in detail included the mandatory no-action alternative, a harvest-only alternative, and three alternatives allowing varying degrees of logging, reforestation, and mitigation.

The alternatives set forth in the FEIS, together with those considered and rejected without detailed analysis, represent a sufficient range of alternatives that gave the Forest Service an opportunity to make a reasoned choice.  The alternatives are not so similar as to be indistinguishable and the Administrative Record reflects that the considered alternatives allowed the Forest Service to make an informed decision.  NEPA does not require anything more.

**4.  Cumulative Impacts**

Plaintiffs contend there is no analysis of cumulative impacts in the FEIS.  The Forest Service counters that it undertook a reasonably thorough discussion of the significant aspects of probable environmental consequences, which is all it is required to do.

Under NEPA, the Forest Service must consider cumulative impacts by giving "some quantified or detailed information." Neighbors of Cuddy Mountain, 137 F.3d at 1379.  The Forest

Service must consider the potential impact of known risks, as well as those that are reasonably foreseeable.  Id. at 1380.

Native Ecosystems makes a general accusation that the FEIS is devoid of cumulative effects analysis.  Native Ecosystems does not support its assertion with cites to the Administrative Record, nor can it, as the record includes a thorough analysis of the cumulative impacts of past, present, and future actions, including impacts from the fire itself and actions on adjacent land.  This analysis meets the hard look requirement of NEPA.

### 5.  Obligation to Supplement

Plaintiffs contend the Forest Service is obligated to supplement the FEIS because the projected costs of the proposed sale changed without explanation and because the actual bid was 20% of the projected high bid.  The Forest Service maintains that economic impacts alone do not require a supplemental environmental impact statement and the proposed sale has a positive net return.

Whether a supplemental environmental impact statement is necessary is a discretionary decision that will not be overturned unless it is arbitrary or capricious.  Friends of the Clearwater, 222 F.3d at 556.  The decision must be based on a consideration of relevant factors.  Id.  An agency that has prepared an environmental impact statement "cannot simply rest on the original document [but] . . . must be alert to new information

23

that may alter the [original] results.  Id. at 557.

After the Record of Decision was issued, the Forest Service determined that there was a modeling error in the original economic analysis.  In June 2001, the economic analysis was performed again using a more accurate model and taking into account the reduced value of burnt timber versus green timber. The new economic analysis calculated a significantly lower projected high bid.

In response to the new economic analysis, the Forest Service issued a Supplemental Information Report.  The Forest Service considered the new data and determined that the selected alternative was still economically viable and still appropriate. The Administrative Record indicates the Forest Service considered the significance of the new information and made a reasoned decision to proceed with the selected alternative without performing a supplemental environmental impact statement.  The Forest Service did not act under a clear error of judgment, nor was its decision arbitrary or capricious.

### 6.  Conclusion

The errors cited by Native Ecosystems do not establish violations of NEPA.  The Forest Service's decision making process in this case was reasoned and thorough as the Forest Service considered relevant information before and after issuing its Record of Decision.  NEPA does not mandate a particular result,

but only that the Forest Service take a hard look at potential
consequences of its proposed action.   The record indicates the
Forest Service met this standard.

### V.   Defendants' Motion to Strike

The Forest Service moves to strike the affidavits of Jeff
Juel and Sara Jane Johnson as outside the scope of the
administrative record.   The Forest Service argues that the
affidavits may not be considered by the Court because they are
not part of the Administrative Record and do not fall into one of
the narrow exceptions articulated in <u>Southwest Center for
Biological Diversity v. U.S. Forest Service</u>, 100 F.3d 1443, 1450
(9th Cir. 1996).

Given the Court's decision to grant summary judgment in
favor of the Forest Service, consideration of Defendants' motion
to strike is not necessary.   The contents of the affidavits do
not alter the Court's decision.   Therefore, the motion is moot.

### VI.   Conclusion

The Forest Service's decision to proceed with the Maudlow-
Toston Salvage Project is entitled to substantial deference and
cannot be overturned unless the Forest Service acted arbitrarily
or capriciously.   The Administrative Record does not reflect
arbitrary or capricious actions.   To the contrary, the record
indicates that the Forest Service undertook a reasoned analysis
of the potential benefits and consequences of proceeding with the

25

proposed sale.  This decision is consistent with the NFMA and the
Helena National Forest Plan and the process leading up to the
decision meets the hard look standard required by NEPA.  To hold
otherwise would be to poke holes in the Forest Service's analysis
and to substitute the Court's judgment for that of the Forest
Service. This the Court cannot do.

        Accordingly, IT IS HEREBY ORDERED:

1.   Plaintiffs' Motion to Strike (dkt #7-1) is DENIED.

2.   Plaintiffs' Motion to for Leave to Amend (dkt #7-2) is
     DENIED.

3.   Plaintiffs' Motion for Summary Judgment (dkt #10) is DENIED.

4.   Defendants' Cross-Motion for Summary Judgment (dkt #14) is
     GRANTED.

5.   Defendants' Motion to Strike (dkt #23) is DENIED as moot.

        IT IS FURTHER ORDERED that the Clerk shall enter judgment by
separate document in favor of Defendants and against Plaintiffs.

        DATED this _____ day of May, 2002.

                              _____
                              DONALD W. MOLLOY, CHIEF JUDGE
                              UNITED STATES DISTRICT COURT